IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Richard Mark Turner, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 06-95-SLR-LPS |
| | : | |
| Dr. Tammy Kastre, et al., | : | |
| | : | |
| Defendants. | : | |

**REPORT AND RECOMMENDATION**
**REGARDING DAMAGES AWARD**

Pending before the Court is Plaintiff Richard Mark Turner's request for damages from Defendant First Correctional Medical ("FCM"). A default judgment has been entered against FCM. In this Report & Recommendation, I provide my recommendation as to the proper calculation of damages.

**BACKGROUND**

A.  **Procedural Background**

Plaintiff Richard Mark Turner is a former inmate who was under the care of Defendant FCM (among other health care providers) during his incarceration. He initiated this action for failure to treat under the Eighth Amendment on February 10, 2006. (D.I. 2) Turner amended his complaint and properly served Defendant FCM; FCM filed its answer to the complaint on December 12, 2007. (D.I. 92) At that time, FCM was represented by attorney Daniel L. McKenty. (*Id.*) Mr. McKenty withdrew from his representation in February 2008. (D.I. 93) In

1

an order dated April 4, 2008, Judge Robinson directed FCM to retain new counsel by June 6, 2008; otherwise FCM's actions would be considered a "failure to defend," leading to entry of judgment against FCM. (D.I. 96) FCM did not retain new counsel, and, thus, Plaintiff's motion for default judgment against FCM was granted on July 30, 2009. (D.I. 116)

This matter was referred to the undersigned magistrate judge on February 23, 2010. (D.I. 137) Thereafter, on March 18, 2010, Plaintiff requested an inquisition hearing to quantify damages as against FCM. (D.I. 145) Notice of the hearing was sent to the last known address of record for Defendant FCM, also on March 18, 2010. The U.S. Post Office returned the notice as undeliverable on March 29, 2010. (D.I. 151)

The damages hearing was held on April 9, 2010. (D.I. 155 (hereinafter "Tr.")) It was attended by Plaintiff and an attorney for Defendant Tammy Kastre, but not FCM or its representative. At the close of hearing, the Court directed Plaintiff's counsel to submit a written summary justifying the amount Plaintiff requested at the hearing as to damages, which was approximately $750,000.00. (Tr. at 27) Plaintiff submitted a memorandum and exhibits purporting to set forth the basis for his damages request on April 13, 2010. (D.I. 154)

B.   **Factual Background**[1]

Plaintiff testified that while an inmate in a state correctional facility, Defendant FCM was a health care provider charged with overseeing his medical care. (Tr. at 10) When he began treatment with FCM, Plaintiff suffered from a "hole" in his leg that would not heal. (*Id.*) He

---

[1] As FCM did not appear at the hearing and a default judgment has been entered against it, Plaintiff's testimony and evidence were not subjected to cross examination or rebuttal. The statements in this Report and Recommendation are, necessarily, based solely on the one-sided evidence of record.

2

repeatedly asked for cultures of the wound to determine the type of infection, but his requests were denied. (*Id.*) Instead, FCM's doctors kept him on an antibiotic that was later shown to be ineffective for his wound, due to a MRSA staph infection. (*Id.*)

A physician, Dr. Vemulapalli, repeatedly recommended that liver biopsies be taken of Plaintiff's liver to determine the extent of damage caused by Plaintiff's hepatitis C (a disease of the liver), but those biopsies were put off by FCM for almost two years. (*Id.*) FCM did at some point begin administering drug therapy to Plaintiff for his hepatitis C, but missed Plaintiff's weekly shot of the drug Interferon several times. (*Id.* at 11-12) Plaintiff's viral load (the measure of hepatitis C in his blood) decreased after starting the Interferon shots, indicating that the treatment was working, but FCM's inconsistency in administering the shots compromised the Interferon treatment regimen. (*Id.* at 13) To compensate, FCM gave Plaintiff an extra 13 weeks of Interferon. (*Id.*) Unfortunately, the extra treatment did not work, and six months later Plaintiff's viral load had almost tripled. (*Id.*) A year after ending treatment, Plaintiff's viral load was almost ten times what it had been when he had begun the Interferon. (*Id.* at 14) Due to his extremely high viral load at the time of the hearing, Plaintiff testified that he is no longer a candidate for treatment; at this point only a liver transplant will help. (*Id.*) Plaintiff is scheduled to meet with a hepatologist to try to get onto a transplant list. (*Id.*)

Plaintiff also stated that the advanced nature of his hepatitis C affects many aspects of his daily life, in addition to being a root cause of his hepatic encephalopathy (a condition in which brain function is impaired due to the liver's inability to remove toxic substances, such as ammonia, from the blood). For example, Plaintiff is unable to sleep more than two or three hours at a time. (*Id.* at 15) The hepatitis C's severity also causes Plaintiff to use the bathroom

very frequently, which aggravates his pre-existing problems with his intestinal tract and causes him stress when away from home. (*Id.*) Plaintiff's chief concern, however, is the progression of hepatic encephalopathy. (*Id.* at 7-8) Over time, the buildup of ammonia interferes with the brain and causes Plaintiff bouts of dementia, confusion, loss of memory, tinitus, loss of concentration, and loss of balance. (*Id.* at 7-9) To treat the hepatic encephalopathy, Plaintiff had been taking the drug Rifaximin for two months at the time of the hearing, at a cost of approximately $1500 per month. (*Id.* at 9) Plaintiff's only health insurance coverage at the time of the hearing was through Medicaid, and that was soon to expire. (*Id.* at 20, 26)

Plaintiff's loss of mental functioning from the hepatic encephalopathy has led to his inability to participate in disciplining his stepdaughter; he also can no longer help her with her homework. Some days his ex-wife, Mary Shan Attiliis, has to "lead [him] by the hand." (*Id.* at 7-8, 19)[2] Plaintiff, aged 54 at the time of the hearing, testified as to his humiliation and embarrassment from both his deteriorating mental condition and his increased reliance on others for assistance with daily activities. (*Id.* at 19)

Ms. Attiliis also testified that Plaintiff's constant need to use the bathroom has interfered with their daily activities, and that his encephalopathy has required many trips to the emergency room. (*Id.* at 20-21) Ms. Attiliis also described Plaintiff's increasing paranoia and "changes in personality" she has observed over the two years they have been together. (*Id.* at 22-23) She also stated that Plaintiff's inability to sleep affected her own sleeping patterns, and both suffered from exhaustion due to lack of sleep. (*Id.* at 23-24)

---

[2]Although divorced, Plaintiff and Ms. Attiliis have resumed their relationship and currently live together. (Tr. at 21)

4

At the conclusion of the hearing, Plaintiff's counsel asked the Court to award damages in an amount of approximately $750,000.00. (*Id.* at 27) The Court directed Plaintiff's counsel to submit a written statement of Plaintiff's damages theory. (*Id.*) Plaintiff submitted a memorandum and exhibits purporting to set forth the basis for his damages request on April 13, 2010. (D.I. 154) Plaintiff's submission requests damages of $1.4 million[3] dollars, for: (a) the cost of a liver transplant, I.C.U. hospital stay, surgeon fees, and surrounding costs (estimated at $500,000); (b) pre-surgery physician visits, blood work, cardio-pulmonary testing (estimated at $100,000); (c) "anti-rejection immunosuppressives based on Plaintiff's age of 54 and [life expectancy of 75 years]," estimated at "$30,000 annually for 21 years;" and (d) "travel expenses, payment for time involving others' help, rides, etc." (estimated at $170,000). (*Id.* at 3) The $1.4 million amount does not include punitive damages, nor, apparently, any damages for mental anguish, pain, or suffering. (*Id.* at 2)

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 55(b)(2), the Court may conduct an inquest into the amount of damages to be awarded following entry of a default judgment. A party who defaults by failing to plead or defend does not admit the allegations in the claim as to the amount of damages. *See Fustok v. Conticommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). Thus, the court must ensure that there is basis for damages awarded. *Id.*; *see also Anheuser-Busch, Inc. v. Philpot,* 317 F.3d 1264, 1266 (11th Cir. 2003) (holding that court has obligation to ensure that

---

[3]Plaintiff states that his damage request is $1.5 million, but the figures he submits add up to $1.4 million. *See* D.I. 154 at 3.

there is legitimate basis for any damages award); *Sierra Foods, Inc. v. Haddon House Food Prods., Inc.*, 1992 WL 245847, at *16 (E.D. Pa. Sept. 22, 1992) (observing that an "inquest" into damages is necessary to be certain that the "damages bear a reasonable relationship to the injuries alleged and established by the facts").

Although the Court is mindful of the advanced and severe nature of Plaintiff's hepatitis C and hepatic encephalopathy, Plaintiff has not submitted evidence – testimonial or documentary – to support his requested medical expenses in either his submission or at the hearing.[4] Plaintiff has not provided the Court with any invoices, bills, insurance statements, or sworn affidavits setting forth the basis for his damage amount estimations. Instead, Plaintiff attached to his statement of damages a CNN.com article discussing Apple CEO Steve Jobs' liver transplant, a printout of cost estimates for liver transplants gleaned from Google Answers.com, and various internet articles describing hepatic encephalopathy. (D.I. 154 Exhibits 1-3) While informative, these documents are not admissible evidence of: (a) the monthly cost of Plaintiff's current treatment of Rifaximin and the number of months per year that Plaintiff requires this treatment; (b) the medical expenses billed, to date, by Plaintiff's treating physician, Dr. Ramesh Vemulapalli, or other treating physicians; (c) the approximate waiting times for liver transplants in the Delaware area and, if available, Plaintiff's rank on any local transplant list; (d) the approximate cost of a liver transplant in the Delaware area (including pre-operative and post-

---

[4]It appears that Plaintiff's physician, Dr. Vemulapalli, intended to attend the damages hearing, but was unable to do so because of illness. (Tr. at 5) Dr. Vemulapalli submitted a short letter (admitted as Exhibit 1 during the hearing) that confirmed Plaintiff's diagnosis of hepatitis C and hepatic encephalopathy and stated that Plaintiff is being referred to a liver transplant program for further evaluation. (*Id.*) Unfortunately, Dr. Vemulapalli's letter does not provide any basis to quantify damages.

operative drug costs); or (e) Plaintiff's proximity to a transplant center and costs of transportation.

Plaintiff was able to establish a reasonable basis for a damages award relating to pain and suffering and emotional distress. *See Carey v. Piphus*, 435 U.S. 247, 264 (1978) ("[M]ental and emotional distress . . . is compensable under § 1983, . . . [with] proof that such injury actually was caused."); *Chainey v. Street*, 523 F.3d 200, 216 (3d Cir. 2008) (same). The testimony put forth at the hearing regarding Plaintiff's inability to sleep and resultant exhaustion, exacerbated intestinal discomfort, mental confusion, loss of concentration, increasing paranoia, loss of memory, humiliation and embarrassment due to his worsening state, and increasing inability to perform daily activities without assistance was credible and persuades the Court that Plaintiff is entitled to damages for his mental and emotional distress.

Thus, I find a basis for damages to be awarded to Plaintiff for his hepatitis C, hepatic encephalopathy, and pain and suffering. However, I have been provided little or no assistance in quantifying these damages. I recommend that Plaintiff be awarded $75,000.00.

I further recommend that Plaintiff's request for punitive damages be DENIED.

\* \* \*

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections **of no longer than ten (10) pages within fourteen (14) days after being served with a copy of this Report and Recommendation.** Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 Fed.

Appx. 924, 925 n.1 (3d Cir. 2006). **A party responding to objections may do so within fourteen (14) days after being served with a copy of objections; such response shall not exceed ten (10) pages. No further briefing shall be permitted with respect to objections without leave of the Court.**

The parties are directed to the Court's Standing Order In Non-*Pro Se* Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, www.ded.uscourts.gov/StandingOrdersMain.htm.

Dated: April 14, 2010

Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE